**FILED**

JUN - 7 2007

U.S. DISTRICT COURT
WHEELING, WV 26003

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
(Wheeling Division)

| | |
|---|---|
| HERMAN STRAUSS, INC., a West Virginia corporation, | Civil Action No. 5.07-CV-74 |
| v. | COMPLAINT |
| ESMARK INCORPORATED, a Delaware corporation | |

**COMPLAINT**

NOW COMES, Herman Strauss, Inc. ("HSI"), by and through its undersigned counsel, and files this Complaint against Defendant Esmark Incorporated ("Esmark"), as follows:

**I.   PARTIES**

1. HSI is a West Virginia corporation with its principal place of business in West Virginia and a mailing address at 35th & McColloch Streets, Wheeling, West Virginia 26003.

2. Esmark is a Delaware corporation with its principal place of business at 2500 Euclid Avenue, Chicago Heights, Illinois 60411.

**II.   JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) insofar as it is a controversy between citizens of diverse states and the amount in controversy is in excess of $75,000.

4. This Court has personal jurisdiction over Defendant Esmark because Esmark regularly transacts business in this District for the purpose of realizing pecuniary benefits, has caused harm and tortious injury in this District by acts or omissions both inside and outside this District, and has entered into a series of transactions and contractual obligations within this District.

5. This District is an appropriate venue for this action under 28 U.S.C. §1391(a)(2) because acts, omissions, and injuries giving rise to HSI's request for damages occurred and are continuing to occur in this District.

### III.   SUMMARY OF CLAIMS

6. As detailed below, for over a century HSI has operated a significant scrap recycling and supply business in West Virginia and surrounding states. Pursuant to three April 8, 2004 written contracts entered into between HSI and Wheeling-Pittsburgh Steel Corporation, HSI agreed for a five-year term to arrange for the supply of all scrap products to be utilized by Wheeling-Pittsburgh's Electric Arc Furnace and Basic Oxygen Furnace located at Wheeling-Pittsburgh's Steubenville, Ohio Plant. Pursuant to these contracts, HSI was supplying nearly $400 million annually in scrap products to Wheeling-Pittsburgh. Beginning in 2006, Esmark publicly announced efforts to gain control of Wheeling-Pittsburgh. In the same timeframe, Esmark launched a campaign to sabotage, interfere with, destroy and ultimately cause the wrongful termination of HSI's contracts with Wheeling-Pittsburgh even though the contracts did not expire until April 2009. With utter disregard for the contractual rights and privileges of HSI, Esmark intentionally and recklessly pursued this course of action notwithstanding the damages it caused and continues to cause to HSI, its employees and the West Virginia and Ohio communities in which they live and work.

7. As a direct and foreseeable result of Esmark's improper and wrongful interference, beginning in late 2006 Wheeling-Pittsburgh breached its contracts with HSI and, as of March 31, 2007, ceased performing under them altogether. Pursuant to arbitration provisions contained in the contracts between HSI and Wheeling-Pittsburgh, HSI has initiated an arbitration to recover in excess of $18.4 million of damages. Based on the claims set forth in this Complaint, HSI seeks the recovery of this same amount from Esmark (to the extent not paid by Wheeling-Pittsburgh) plus punitive damages and other remedies recoverable under West Virginia law as redress for the harm caused to HSI by Esmark.

## IV.   STATEMENT OF FACTS

8. HSI is in the business of buying, handling, processing, selling and delivering scrap metal and related products. The business was started in Wheeling, West Virginia by Herman Strauss in the early part of the 20th Century. It was operated by his son until his death in 1982 and, since 1982, has been operated by his grandson, Carter W. Strauss. HSI is West Virginia's oldest and largest metals recycler and, at all times relevant to the disputes hereby submitted, operated from four separate sites, including three scrap yards, that managed 160,000 tons of inventory.

9. Esmark is an Illinois-based steel services company that acquires products from metal producers and resells them (sometimes after further processing) to end users. Esmark is primarily owned by the Bouchard Group and has been operated since its founding by James P. Bouchard and his brother, Craig T. Bouchard.

10. Wheeling-Pittsburgh Steel Corporation (hereafter "WPSC") is an integrated producer of steel products that operates manufacturing facilities in Ohio, Pennsylvania and West Virginia.

11. Esmark and WPSC are and remain separate and distinct legal entities.

**HSI-WPSC Agreements**

12. Since the 1980's, steel production in the United States has depended less and less on primary steel manufacturing facilities and to a much greater extent on electrically powered furnaces that utilize scrap products as a major raw material. In 2003 and 2004, WPSC began constructing a new electric arc furnace ("EAF") at its Steubenville, Ohio Plant that was designed to utilize scrap products as its principal raw material. In addition, WPSC also utilized scrap products in connection with the operation of a basic oxygen furnace ("BOF") located at WPSC's Steubenville, Ohio Plant.

13. While HSI and WPSC had done business with each other on prior occasions, beginning in 2003 and culminating with execution of a Sales Agreement dated as of April 8, 2004 ("Sales Agreement") and a Scrap Handling Facility Operations Agreement dated as of April 8, 2004 (the "Operations Agreement"), HSI and WPSC negotiated a comprehensive series of contracts that encompassed the following major transactions:

    a. Pursuant to a Lease Agreement also dated as of April 8, 2004, WPSC leased to HSI a 21.685 acre parcel located in Steubenville, Ohio (the "Leased Premises") for the purpose of permitting HSI to provide necessary structures, facilities and equipment to furnish all scrap products to be utilized by WPSC. The Lease Agreement was for a five-year term at a nominal rent of $1 per year.

    b. Pursuant to the Operations Agreement, HSI agreed to construct, purchase and/or lease buildings, structures, equipment and improvements on the Leased Premises such as would allow HSI to process and supply all scrap products to be used by WPSC in its

melting facilities; i.e., WPSC's EAF and BOF. The Operations Agreement required HSI to construct and/or provide, among other things, a barge unloading facility along the border of the Leased Premises adjacent to the Ohio River, an office facility, scrap handling equipment, rail facilities, gondola cars, roads, scales (truck & rail), concrete pads and fuel tanks. In accordance with the Operations Agreement HSI arranged to provide the foregoing facilities, equipment and improvements; the purchase cost of which was in excess of $6.2 million. The Operations Agreement provided for an initial term of five years and for the payment by WPSC to HSI of its total "Operational Costs" plus 5%; said Operational Costs (as defined in the Operations Agreement) to include the cost of all capital expenditures by HSI at the scrap handling facility (amortized evenly over a 60-month period), all leased equipment costs payable by HSI, all personal property tax or similar tax assessments, all financing costs of the inventory of scrap products maintained for WPSC and all other operating expenses incurred by HSI including "taxes, payroll, utilities, licenses and all other ordinary and necessary expenses."

c.  Pursuant to the Sales Agreement, for a five-year term WPSC agreed to purchase, and HSI agreed to supply, 100% of WPSC's scrap products requirements for its scrap melting operations at the EAF and BOF. As provided in Article IV, Paragraph 6 of the Sales Agreement, the price to be paid by WPSC for scrap products depended upon the type of products and their source. The primary types of scrap products purchased from third parties by HSI for WPSC, or purchased by HSI at WPSC's direction from specified third parties, were to be priced at HSI's cost plus a commission to HSI of $3.00 per ton. Purchases of certain scrap products ("unprepared scrap, pig iron and HBI") were to be priced as "determined by mutual agreement of the parties on a case-by-case

5

basis"; a provision that, in practice, resulted in such products being priced at HSI's cost plus $5.00 per ton. In cases where scrap products were available directly from HSI's own facilities in Weirton, West Virginia and elsewhere, HSI would on occasion be directed by WPSC to directly sell and supply such products to WPSC at the prices quoted by HSI without addition of a $3.00 per ton commission. Lastly, scrap products purchased by HSI from WPSC itself that were usable in the EAF or BOF and could be redelivered to WPSC, were redelivered at HSI's purchase cost from WPSC with no commission to HSI. Because scrap products stored on the Leased Premises were obtained from multiple suppliers (including WPSC itself) at differing prices, Paragraph 6 of the Sales Agreement provided a procedure for determining "an average cost" as the basis for invoicing WPSC for scrap products delivered from the Leased Premises and consumed by the EAF or BOF.

14. Taken together, the Lease Agreement, Operations Agreement and Sales Agreement (hereafter collectively the "Agreements") provided WPSC with the economic benefit of HSI's experience and efficiency in the scrap business and allowed WPSC to "off load" the considerable long term capital requirements of developing, constructing and operating a high volume scrap processing and delivery facility. The Agreements also placed the purchase cost of maintaining a minimum working inventory of scrap on HSI and struck an appropriate balance between HSI's desire to limit its credit risk by retaining title to all scrap products to be sold to WPSC until the point they were actually delivered for consumption by the EAF or BOF and, on the other hand, WPSC's desire to minimize its working capital requirements by obtaining "just in time" delivery of raw materials that it did not need to pay for until it used them.

15. Beginning in 2004 and continuing through most of 2006, performance under the combination of the Agreements by WPSC and HSI occurred in a mutually acceptable and commercially reasonable manner. In return for (a) the considerable investments arranged by HSI, (b) the extension of credit by HSI to WPSC provided for in the Operations Agreement and Sales Agreement and (c) HSI's undertaking to insure an adequate inventory and supply of all WPSC's scrap product needs, HSI received the Operational Costs <u>plus</u> 5% payments (on qualifying Operational Costs) under the Operations Agreement as well as the agreed price per ton (plus commission payments where applicable) due under the Sales Agreement for all scrap products consumed by WPSC.

16. The financial size of the contractual arrangements was very significant for both HSI and WPSC. During 2004, for example, HSI supplied approximately 304,000 gross tons of scrap products to WPSC at a total price of $95.8 million, even though deliveries during 2004 did not begin to the BOF until July, and the EAF did not go into initial service until late in the year. During 2005, the first full year under the Agreements, total scrap product sales were 1,260,000 gross tons at a total price of $363 million. During 2006, scrap product sales increased to 1,365,000 gross tons at a total price of $396 million.

### Esmark's Interference

17. Initially unbeknownst to HSI, during the Summer of 2005 Esmark approached WPSC about a possible combination of their respective businesses. Esmark and WPSC entered into a confidentiality arrangement in July 2005 and, on various occasions during late 2005 and early 2006, Esmark proposed a merger with WPSC with Esmark being the surviving corporation. According to Esmark, WPSC did

7

not respond to Esmark's merger offers and, instead, announced on May 5, 2006 that it was in discussions with a steel producer located in Brazil concerning a potential strategic alliance.

18. On July 17, 2006, Esmark publicly disclosed its rejected efforts to form an alliance with WPSC and further announced its intention to seek the election of an Esmark "slate" of directors at WPSC's November 2006 Annual Meeting; in effect an "unfriendly takeover" of control. From mid-July through November 17, 2006, a highly publicized battle for control of WPSC occurred.

19. During the course of this battle James P. Bouchard, the founder, CEO and Chairman of the Board of Esmark, spoke publicly (and in filings with the Securities Exchange Commission) on numerous occasions regarding Esmark's plans. Of specific import to this action, on August 23, 2006 in a recorded interview that occurred in West Virginia, Mr. Bouchard discussed Esmark's plans for WPSC and as part of his comments stated:

> We have an agreement in writing from one of the largest scrap companies in the United States who will be able to supply all scrap needed for the Wheeling-Pittsburgh facility. They will also come on site and start to manage that whole process for us in a more effective way than it is being managed today and they have committed to the scrap supply to handle north of 2,000,000 tons on the EAF [electric arc furnace].

As is self-evident, this statement by Mr. Bouchard indicated Esmark had no regard for the fact that the Agreements were in effect and had a minimum remaining term as of August 2006 of more than 2½ years.

20. No later than by its August 23, 2006 public announcement, Esmark expressed its clear intention to replace HSI as WPSC's scrap supplier and operator despite the fact that WPSC already had existing and extensive scrap supply contracts

8

with HSI. Esmark's actions were part and parcel of its plan to cause WPSC to conduct business with companies (including scrap suppliers) chosen by Esmark. In furtherance of its plan, Esmark engaged in a course of action intended to interfere with and destroy, and which did interfere with and destroy, the contractual relationships between HSI and WPSC.

21. At the time of its August 23 announcement and thereafter, on information and belief Esmark was fully aware of the Agreements and the ongoing contractual relationship between HSI and WPSC. Notwithstanding this knowledge, Esmark intentionally interfered with HSI's contractual relationships with WPSC by, among other things: (a) obtaining an "agreement in writing" from one or more scrap companies in the United States to both supply all of WPSC's scrap needs and also to operate WPSC's scrap facilities, both in replacement of HSI; (b) publicly announcing its intention to restructure WPSC's scrap supply relationship; and (c) inducing WPSC to take such actions in breach of the Agreements.

22. After considerably more corporate warfare between Esmark and WPSC, at the November 17, 2006 Annual Meeting of WPSC a majority of its shareholders voted in favor of the Esmark slate of directors and, within several days thereafter and in accordance with its announced plans, WPSC's newly elected Board of Directors appointed James P. Bouchard as CEO of WPSC and the Board and/or Mr. Bouchard replaced members of WPSC's management.

23. Concurrent with the change of control, WPSC announced it was in breach of financial covenants contained in its credit facility and, contrary to its prior contractually required forecasts provided to HSI, advised HSI it intended to cease production from its EAF until sometime in December 2006. On information and belief,

incident to Esmark's successful "hostile takeover" of WPSC, Esmark continued in earnest to disrupt the previously efficient and smooth performance of the Agreements.

24. Based upon WPSC's announced financial difficulties, its suddenly erratic changes in plans regarding scrap products usage and, last but not least, a concern by HSI regarding the statements made by Esmark on August 23, 2006, HSI sent a letter to WPSC dated November 28, 2006 in which it requested adequate assurance of WPSC's intention to perform its Agreements with HSI. HSI received no response to its letter. Nor did HSI receive any updated or better information regarding WPSC's intended scrap products usage. As a result, HSI continued to experience an increasing risk relating to WPSC's performance of the Agreements while, at the same time, HSI's scrap products inventory purchased for WPSC's use began to balloon dramatically with a resulting financial strain on HSI's own ability to operate within the requirements of its credit facilities.

25. It was not until December 28, 2006 that HSI personnel were directed to attend a meeting on short notice, at which HSI was advised by personnel brought in by Esmark of a further delayed proposed date for start-up of the EAF and heat forecasts that would entail significant additional financial risk to HSI. At that same meeting, HSI was advised that unless it provided more attractive payment terms than were set forth in the Operations and Sales Agreements, WPSC would purchase scrap products from other sources without paying anything to HSI, notwithstanding the supply and commission provisions of the Sales Agreement. HSI declined the extra-contractual modifications demanded by WPSC.

26. HSI's personnel were subsequently advised to attend another meeting on January 8, 2007, a meeting attended by James Bouchard, Esmark's CEO and by that

time an officer of WPSC as well. Mr. Bouchard told HSI personnel that based on Esmark's industry knowledge the prices stipulated in the Agreements were unacceptable and that while HSI could be enormously damaged by a default by WPSC, Esmark would actually profit substantially if WPSC defaulted and/or filed for bankruptcy.

27. The course of action initiated and fostered by Esmark caused WPSC to alter its performance under the Agreements, including making demands for economic concessions at the December/January meetings. Prior to Esmark's interference, no such demands had been made and WPSC was performing its obligations. However, as Esmark became involved the entire relationship between WPSC and HSI changed with Esmark and WPSC attempting to gain leverage over HSI by altering WPSC's performance of its obligations and demanding that HSI provide economic concessions despite the clear terms of the Agreements.

28. During this time, WPSC continued to widely deviate from its scrap products usage forecasts, consuming much less than it projected. As a result, by letter dated January 12, 2007, HSI notified WPSC it would suspend further scrap products purchases from WPSC until inventories came back into balance and also provided WPSC with a Notice of Default under the Agreements. In the same letter, however, HSI proposed to use "every reasonable effort" to resolve the disputes through "good faith discussions."

29. What followed over the next two months was a barrage of letters between WPSC's newly hired personnel and HSI in which WPSC accused HSI of an increasing crescendo of alleged safety violations, overcharges, breaches of contract relating to scrap metal sales and a host of other unfounded, and constantly shifting, wrongdoing. HSI responded in writing to dispel each alleged claim, often pointing to documents in

WPSC's own possession and statements by WPSC's own personnel that contradicted the very contentions being advanced. As this exchange continued, however, the financial strain on HSI increased as its scrap products inventory grew to the point where it had accumulated more than $55 million of scrap products for WPSC's use (based upon WPSC's own forecasted needs) and WPSC refused to pay for amounts owed to HSI by WPSC for scrap products that were consumed by WPSC. This combination of factors threatened economic ruination for HSI.

30. WPSC's new personnel did not withdraw any of their allegations against HSI as a result of the responses provided by HSI and, instead, simply alleged newer and fresher disasters. Further, instead of pursuing negotiations to resolve either the problems asserted by HSI or itself, WPSC advised HSI that <u>HSI</u> was in default under the Agreements and continued to withhold payments due.

31. By letter dated March 16, 2007, HSI advised WPSC that WPSC was in arrears in payments due to HSI in the amount of $2.8 million and that WPSC's actions on several fronts were in direct breach of its obligations under the Agreements. This letter referenced WPSC's refusal to address a resolution of the disputes and set forth HSI's belief that it was "both appropriate and prudent to submit these disputes to binding arbitration in accordance with the terms of the [Agreements]".

32. By letter dated March 26, 2007, WPSC "responded" to the March 16, 2007 letter by saying nothing about negotiations or arbitration. Instead, WPSC notified HSI that the Agreements were terminated and that HSI should "make all necessary arrangements to remove all HSI personnel from WPSC facilities by March 31, 2007."

33. At all times relevant to the cause of action asserted herein and notwithstanding WPSC's breaches and non-performance, HSI performed its duties and

obligations under the Agreements including, but not limited to, continuing to perform to the best of its ability notwithstanding Esmark's announced intent to replace HSI, WPSC's refusal to provide adequate assurance of future performance, WPSC's non-payment of amounts due, WPSC's constantly missed forecasts of scrap products requirements, and demands that WPSC be allowed to ignore or reject several of the material terms and conditions of the Agreements. Moreover, even though HSI curtailed purchase of scrap products from WPSC for the reasons set forth above, HSI nonetheless maintained at all times much more than an adequate scrap products inventory to meet all of WPSC's consumption requirements.

34. On the other hand, consistent with Esmark's announced intent to replace HSI, WPSC failed to perform its obligations under the Agreements and engaged in a course of conduct, intentionally or at least in utter disregard for its obligations to HSI under the Agreements, calculated to lead to multiple breaches and wrongful termination of the Agreements by WPSC.

35. On information and belief, throughout 2006 and into 2007 Esmark orchestrated a campaign with the express intention and goal of causing, creating and encouraging interference with the contractual relationships between WPSC and HSI with the specific intent of causing a breach and termination thereof. Approximately seven months after Esmark announced its intentions, Esmark succeeded in causing the complete destruction of the previously well-functioning contractual relationship between WPSC and HSI. As a result, HSI has suffered and will continue to suffer substantial damages.

## V. DAMAGES INCURRED BY HSI

36. HSI is entitled to recover from Esmark all damages HSI has suffered as a result of Esmark's intentional interference with the Agreements, including interference which induced or otherwise caused WPSC not to perform its obligations under the Agreements. While the economic damages to HSI are continuing and have not yet been fully ascertained, HSI has thus far incurred compensatory damages of at least $18,400,638.56, which are detailed in a Demand for Arbitration HSI has concurrently filed against WPSC. All of these compensatory damages are recoverable from Esmark, to the extent not recovered in the Arbitration, by virtue of Esmark's tortious interference with the Agreements that induced or otherwise caused WPSC's multiple breaches and wrongful termination of the Agreements.

37. While HSI reserves the right to amend its claims as the nature and amount of damages incurred by it continues to unfold, the categories and amounts of damages thus far incurred include the following:

(a) Compensatory damages of approximately $7 million for the period through the wrongful termination of the Agreements by WPSC on March 31, 2007, which include amounts for: (1) unpaid invoices for scrap products consumed by WPSC in excess of prior estimates; (2) unpaid freight charges on deliveries of scrap products from HSI directly to the EAF and/or BOF; (3) improper deductions taken by WPSC based upon WPSC's erroneous calculations including incorrect double billing and various charges for scrap products allegedly delivered to HSI by WPSC which were not, in fact, delivered; (4) commissions due under the Sales Agreement; (5) unpaid Operational Costs (plus 5%) pursuant to the Operations Agreement; and (6) other improper deductions.

14

(b)   Compensatory damages in excess of $11.4 million for the period after March 31, 2007, which include: (1) costs relating to the purchase of specific scrap products for WPSC's consumption, which WPSC has now refused to purchase; (2) commissions that would have been due under the Sales Agreement for the supply to WPSC of all scrap products utilized in the EAF and BOF through April 7, 2009; (3) Operational Costs and related payments that would have been due pursuant to Paragraph 6A of the Operations Agreement through April 7, 2009; and (4) lease payments for equipment purchased pursuant to the Operations Agreement.

## COUNT I
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

38.   HSI incorporates by reference its allegations in Paragraphs 1 through 37 above.

39.   Three contractual and business relationships existed between WPSC and HSI as set forth in the Agreements.

40.   At all times material hereto, Esmark was aware of the existing contractual relationships between WPSC and HSI.

41.   At all times material hereto, Esmark and WPSC were separate and distinct legal entities.

42.   Esmark is not a party to the Agreements.

43.   By engaging in the conduct described above Esmark, acting without any right or privilege whatsoever under the circumstances, intentionally, willfully, and without justification interfered with existing contractual relationships between HSI and WPSC resulting in WPSC breaching and repudiating the Agreements.

44. Esmark acted as set forth above to deprive HSI of its contractual rights and the benefits of its bargains or, alternatively, with reckless and malicious disregard of HSI's rights and reasonable expectations under the circumstances.

45. Esmark acted willfully, wantonly, and maliciously in disregard of HSI's rights.

46. Esmark's intentional conduct, which interfered with HSI's existing and prospective contractual rights and relations with WPSC, caused HSI to sustain serious and substantial injury.

47. HSI seeks damages and other relief as set forth below.

## RELIEF

WHEREFORE, Herman Strauss, Inc. respectfully requests the entry in its favor of a judgment against Esmark Incorporated for damages in excess of the jurisdictional requirements of 28 U.S.C. § 1332(a)(1), including:

(1) compensatory damages in the nature and in the amount to be proved at trial to fully compensate HSI for all damages and injury sustained or to be sustained by HSI as a direct and proximate result of Esmark's wrongful conduct as alleged herein;

(2) punitive damages;

(3) all costs and expenses, including attorney's fees and expert witness fees, incurred by HSI;

(4) interest on all sums or money damages awarded to HSI in this action; and

(5) such other and further relief as the Court deems just and proper under the circumstances.

## JURY DEMAND

Herman Strauss, Inc. demands a trial by jury.

>Respectfully submitted,
>
>*/s/ William A. Kolibash*
>William A. Kolibash, Esq.
>WV Bar No. 2087
>Denise Knouse-Snyder, Esq.
>WV Bar No. 7073
>PHILLIPS, GARDILL, KAISER &
> ALTMEYER, PLLC
>61 Fourteenth Street
>Wheeling, WV  26003
>304-232-6810
>304-2323-4918 – Fax
>williamkolibash@pgka.com
>denisesnyder@pgka.com
>
>
>Joseph F. McDonough, Esq.
>MANION McDONOUGH & LUCAS, P.C.
>Suite 1414 - U.S. Steel Tower
>600 Grant Street
>Pittsburgh, PA  15219
>412-232-0200
>412-232-0206 - Fax

Dated:  June 7, 2007